Merrimack
No. 2005-765

## MAXI DRUG NORTH, INC. d/b/a BROOKS PHARMACY & a.

v.

## COMMISSIONER, NEW HAMPSHIRE DEPARTMENT OF HEALTH AND HUMAN SERVICES

Argued: March 16, 2006
Opinion Issued: August 22, 2006

*Cook & Molan, P.A.*, of Concord (*Glenn R. Milner* on the brief, and *John S. Krupski* orally), for the petitioners.

*Kelly A. Ayotte*, attorney general (*Suzanne M. Gorman*, senior assistant attorney general, on the brief and orally), for the State.

DALIANIS, J. The petitioners, five pharmacies participating in New Hampshire's Medicaid program, appeal from an order of the Superior Court (*McGuire*, J.) denying their petition for a declaratory judgment and granting the State's request for declaratory and injunctive relief. We affirm.

The Medicaid program is a joint state and federal program under which the federal government provides financial support to States that establish and administer a state Medicaid program, in accordance with federal law, through an approved state plan. The New Hampshire Department of Health and Human Services (DHHS) administers New Hampshire's state plan. DHHS' responsibilities include setting the rates of government reimbursement for providers of Medicaid goods and services. Pursuant to the state plan, the petitioners provide pharmaceuticals and pharmacy services to Medicaid customers, and are reimbursed for the pharmaceuticals by DHHS.

RSA 126-A:3, III(a) (2005) includes a requirement, which states:

Notwithstanding any provision of law to the contrary, and notwithstanding any fee, rate, or payment schedule established under the medical assistance program pursuant to RSA 161 and RSA 167 or any other fee, rate, or payment schedule for any other program of [DHHS], no provider shall bill or charge [DHHS] more than the provider's usual and customary charge
. . . .

Subject to certain exceptions, "usual and customary" means "the lowest charge, fee, or rate charged by a provider for any product or service at the time such product or service was provided." RSA 126-A:3, III(b) (2005). NEW HAMPSHIRE ADMINISTRATIVE RULES, He-W 570.14 states that payment for pharmaceuticals shall be reimbursed at the least of four distinct rates, including "the usual and customary charge to the general public."

Prior to January 12, 2004, the standard DHHS reimbursement rate for pharmacies was the average wholesale price (AWP) minus twelve percent, plus a dispensing fee of $2.50. On December 15, 2003, the commissioner of DHHS issued a letter to pharmacy providers stating that preliminary audits of pharmacies indicated overcharges to the State in violation of State law, and that DHHS would be "stepping up the audit activity" as a

result. Shortly thereafter, on January 8, 2004, the commissioner issued another letter, declaring that a "temporary rate change" would go into effect on January 12, 2004, to address the situation, and would remain in effect for a minimum of six months. Pursuant to the "temporary rate change," DHHS would presume the "usual and customary charge" for pharmacies to be the AWP minus sixteen percent, plus a dispensing fee of $1.75, and would reimburse pharmacies accordingly. The letter further stated that an individual pharmacy could exempt itself from the presumed rate upon a clear demonstration that the presumption did not reflect its usual and customary charge.

The petitioners thereafter sought a declaratory judgment in superior court pursuant to RSA 541-A:24 (1997), claiming that DHHS "unilaterally promulgated a new reimbursement rate for pharmacy providers without adhering to the mandatory rulemaking procedures of the Administrative Procedures Act (APA), RSA 541-A" when it issued the January 8, 2004 letter. Among other things, the petitioners requested that the temporary rate be declared invalid and that they be reimbursed for all losses related to its application. DHHS counterclaimed, alleging that the petitioners refused to cooperate with its audits and requesting an injunction prohibiting them from continuing to do so. The superior court concluded, however, that the January 8, 2004 letter was not a rule, and that it merely implemented RSA 126-A:3, III. Accordingly, the superior court ruled that DHHS did not promulgate an invalid rule when it issued the January 8, 2004 letter, and that DHHS had the right to obtain the petitioners' acquisition cost records.

On appeal, the petitioners urge this court to find: (1) that the commissioner's January 8, 2004 letter constitutes an agency "rule" as defined in RSA 541-A:1 (Supp. 2005); and (2) that the invoice information of individual pharmacies is unrelated to the government's interest in conducting audits to determine compliance. We address each issue in turn.

The petitioners first assert that the commissioner's letter of January 8, 2004 constitutes an agency "rule" subject to the rulemaking requirements of the APA. For the purposes of the APA, a "rule" is defined as:

> each regulation, standard, or other statement of general applicability adopted by an agency to (a) implement, interpret or make specific a statute enforced or administered by such agency or (b) prescribe or interpret an agency policy, procedure or practice requirement binding on persons outside the agency, whether members of the general public or personnel in other agencies.

RSA 541-A:1, XV (Supp. 2005). The trial court did not reach the issue of whether the letter fell within this definition. Rather, the trial court concluded that RSA 126-A:3, III empowers the DHHS commissioner to enforce it "without resorting to formal rulemaking," and that the commissioner exercised this power by "presuming a particular rate" in the January 8, 2004 letter. We disagree.

The trial court, in reaching its conclusion, relied upon *Nevins v. New Hampshire Department of Resources and Economic Development*, in which we stated that "promulgation of a rule pursuant to RSA chapter 541-A is not necessary to carry out what a statute authorizes on its face." *Nevins v. N.H. Dep't of Resources and Economic Dev.*, 147 N.H. 484, 487 (2002); *see also Smith v. N.H. Bd. of Psychologists*, 138 N.H. 548, 553 (1994). In *Nevins*, we considered RSA 227-H:9 (2000), which empowers the New Hampshire Department of Resources and Economic Development (DRED) to "make contracts for the leasing of privileges and concessions." *Nevins*, 147 N.H. at 487. Though RSA 227-H:9 grants DRED a specific power "on its face," we nevertheless recognized that it was "not sufficiently detailed to effectuate its purpose," and that DRED was therefore required to promulgate rules. *Id.* We only upheld DRED's actions against the petitioners' challenge because the petitioners could not identify any specific way in which they were prejudiced by the agency's failure to adopt rules. *Id.* at 488.

RSA 126-A:3, III does not, "on its face," authorize DHHS to implement or enforce its provisions, either generally or by the more specific method of amending presumptive reimbursement rates. It merely sets forth a provider's obligations to DHHS when seeking reimbursement under the state plan. If the statute grants any authority to implement or enforce those obligations, it does so only by implication. While it may be true that the January 8, 2004 letter represented an effort by DHHS to implement the requirements of RSA 126-A:3, III, we do not believe that the statute authorized such action in a way that exempted DHHS from the rulemaking requirements of RSA chapter 541-A.

■ Thus, we must consider whether the letter was indeed a "rule" pursuant to the definition set forth in RSA 541-A:1, XV. Because it "institut[es] a temporary rate change" applicable to all pharmacy providers seeking reimbursement pursuant to the state plan, it is plainly a "statement of general applicability adopted by an agency." RSA 541-A:1, XV. Furthermore, the letter "prescribe[s] . . . an agency policy . . . binding on persons outside the agency," *id.*, in that it lowers the presumed "usual and customary charge" for all pharmacy providers from AWP minus twelve percent plus a $2.50 dispensing fee to AWP minus sixteen percent

plus a $1.75 dispensing fee. As such, we believe that the January 8, 2004 letter, insofar as it instituted a "temporary presumption" binding upon all pharmacy providers, was a "rule" as defined by RSA 541-A:1, XV.

Though we find that DHHS engaged in rulemaking by changing the presumptive rate of reimbursement for the purposes of NEW HAMPSHIRE ADMINISTRATIVE RULES, He-W 570.14(a), we nevertheless conclude that the rule at issue was exempt from the requirements of the APA.

The DHHS commissioner must comply with RSA chapter 541-A when adopting rules relative to matters necessary to implement the duties set forth in RSA chapter 161. RSA 161:4-a, IX (2002). Such duties include supervising the development and administration of the state Medicaid plan. RSA 161:4, I (2002); RSA 161:2, VI (Supp. 2005); *see also* N.H. ADMIN. RULES, He-W 520.02(a) ("The department of health and human services shall ... [d]evelop and administer the federal Title XIX [Medicaid Act] State Plan, pursuant to applicable federal regulations and RSA 161:2, VI ...."). The DHHS commissioner is also required to establish rates of reimbursement to providers of medical services under the medical assistance program administered under RSA chapters 161 and 167. RSA 161:4, VI(a) (2002).

■The procedure for adopting rules pursuant to the APA is set forth in RSA 541-A:3 (1997), which requires:

I.   Filing a notice of the proposed rule under RSA 541-A:6 ... ;

II.  Providing notice to occupational licensees or those who have made timely requests for notice as required by RSA 541-A:6, III;

III. Filing the text of a proposed rule under RSA 541-A:10;

IV.  Holding a public hearing and receiving comments under RSA 541-A:11;

V.   Filing a final proposal under RSA 541-A:12;

VI.  Responding to the committee when required under RSA 541-A:13; and

VII. Adopting and filing a final rule under RSA 541-A:14.

However, RSA 541-A:21, III (Supp. 2005) states that "[r]ules adopted under RSA 161:4, VI, relative to rates of reimbursement to providers of medical services under the medical assistance program, shall be exempt from the requirements of RSA 541-A:5 through RSA 541-A:14." Thus, while rules, relative to rates of reimbursement, adopted by the DHHS

commissioner pursuant to RSA 161:4, VI are not exempt from RSA 541-A:3, they are exempt from each of that statute's enumerated provisions and, therefore, the rulemaking requirements of the APA. *See also* RSA 161:4, VI(a) (publication of rates of reimbursement established pursuant to RSA 161:4, VI(a) is exempt from the provisions of the APA).

■ Pursuant to RSA 541-A:22, I (Supp. 2005), "[n]o agency rule is valid or effective against any person or party, nor may it be enforced by the state for any purpose, until it has been filed as required in [RSA chapter 541-A]." Moreover, RSA 541-A:23 (1997) states that failure to file a rule with certain designated entities will prevent a rule from taking effect. Rules adopted by the DHHS commissioner pursuant to RSA 161:4, VI are not exempt from these provisions. However, RSA 541-A:22 and RSA 541-A:23 merely set forth consequences for failing to adhere to the various filing requirements of RSA chapter 541-A, which the DHHS commissioner is exempt from under RSA 541-A:21, III. As such, they do not render rules adopted by the DHHS commissioner pursuant to RSA 161:4, VI invalid.

■ The petitioners contend that the exemption for rules adopted under RSA 161:4, VI does not apply in this case because DHHS acted under the "specific statutory grant of authority" of RSA chapter 126-A. However, the only section of that chapter offered by the petitioners in support of their position is RSA 126-A:5, IV (Supp. 2005), which states that the DHHS commissioner shall have, pursuant to RSA chapter 541-A, "the authority to establish fees, copayments or any other charges for services or assistance provided by or on behalf of [DHHS]." In its letter of January 8, 2004, despite the "temporary rate change" language, DHHS established only a *presumption* as to the pharmacies' "usual and customary charge" for purposes of reimbursement. It instituted no fee, co-payment, or charge as described in RSA 126-A:5, IV, and, as such, that statute does not apply. Rather, by adopting a rule relative to rates of reimbursement to medical providers, DHHS acted pursuant to the mandate set forth in RSA 161:4, VI. Therefore, the petitioners' argument must fail.

The petitioners next contend that DHHS is not entitled to access invoice information from individual pharmacies, claiming that such information "is wholly unrelated to the government's interest in conducting . . . compliance reviews." We disagree.

On March 31, 2004, and June 1, 2004, the DHHS commissioner sent letters to the petitioners informing them that DHHS was conducting compliance reviews of Medicaid provider pharmacies to ensure compliance with RSA 126-A:3, III. The letters requested, among other things, "[i]nvoices for the months of July 2000, March 2001, March 2002, March 2003 and 2004 [*sic*] showing actual acquisition costs for the fifty (50)

highest cost and fifty (50) highest volume pharmaceuticals." The commissioner noted that DHHS was conducting the compliance reviews "pursuant to its authority under State and Federal law, including but not limited to RSA 161:2 XV, He-W 570.14(f), and 42 C.F.R. § 456.23, as well as the Medicaid provider enrollment agreement."

██ Pursuant to RSA 161:2, XV, DHHS is charged with "[i]nvestigat[ing] . . . suspected violations of law or rules relative to programs administered by [DHHS]." RSA 161:2, XV (2002). In December 2003 and January 2004, DHHS informed all pharmacy providers seeking Medicaid reimbursement from the State, including the petitioners, that preliminary audits indicated that many pharmacies were violating State law, and that investigations would be forthcoming. As such, DHHS was acting within its statutorily mandated duties by conducting reviews of Medicaid provider pharmacies for the purpose of assuring compliance with RSA 126-A:3, III.

Furthermore, pharmaceutical providers are required by State law to make "[i]nvoices showing the actual acquisition cost of the pharmaceuticals and supplies" available to DHHS "for utilization and review purposes." N.H. ADMIN. RULES, He-W 570.14(f)(3). In its letters of March and June 2004, DHHS requested "[i]nvoices . . . showing actual acquisition costs" for a certain set of pharmaceuticals in specific monthly time periods. By doing so, DHHS did not demand any more information than the petitioners were required to make available under State law.

*Affirmed.*

BRODERICK, C.J., and GALWAY and HICKS, JJ., concurred; DUGGAN, J., dissented.

DUGGAN, J., dissenting. Because I believe that the legislature did not intend to exempt all rules adopted under RSA 161:4, VI from all of the requirements of the APA when it readopted the APA in 1994, I respectfully dissent.

I agree with the majority that the action taken by DHHS constitutes a rule. I also agree with the majority that the rule does not simply "carry out what a statute authorizes on its face." *Smith v. N.H. Bd. of Psychologists*, 138 N.H. 548, 553 (1994). I disagree, however, with the majority's interpretation of RSA 541-A:21, III (Supp. 2005).

I begin by examining the language of the statute. *Appeal of N.H. Dep't of Transportation*, 144 N.H. 555, 556 (1999). RSA 541-A:21, III provides:

Rules adopted under RSA 161:4, VI, *relative to rates of reimbursement to providers of medical services under the*

> *medical assistance program*, shall be exempt from the requirements of RSA 541-A:5 through RSA 541-A:14.

(Emphasis added.) While the majority views the exemption as applying to "rules relative to rates of reimbursement," they do not view the exemption as applying only to a *portion* of the rules adopted under RSA 161:4, VI. The majority reads the statute as granting an exemption to *all* rules adopted under RSA 161:4, VI. The majority thus construes the emphasized phrase ("relative to rates of reimbursement to providers of medical services under the medical assistance program") as merely descriptive of the preceding phrase ("Rules adopted under RSA 161:4, VI").

Under this construction, the interpretation of the statute would not change if the emphasized phrase were completely removed from the statute. If possible, however, every word of a statute should be given effect. *State v. Tardiff*, 117 N.H. 53, 56 (1977). The majority's construction treats these words as mere surplusage in disregard of our prior observation that the legislature is not inclined to "waste its words." *Glick v. Town of Ossipee*, 130 N.H. 643, 645 (1988).

In my view, the emphasized phrase is a *limitation* on the preceding phrase. *See id.* at 646. Thus, the legislature may have intended the statute to exempt only those rules adopted under RSA 161:4, VI that are "relative to rates of reimbursement." These two reasonable ways of interpreting the emphasized phrase (description versus limitation) make the statute ambiguous. Faced with this ambiguity, I would consider the statute's legislative history. *Lamy v. N.H. Pub. Utils. Comm'n*, 152 N.H. 106, 108 (2005).

RSA 161:4, VI and RSA 541-A:21, III share a common legislative history. Laws 1991, chapter 127 amended RSA 161:4 by inserting the following after paragraph V:

> VI. Medical Assistance Program. The director of the division of human services and the director of the division of mental health and developmental services if authorized pursuant to RSA 126-A:4, IV, shall establish rates of reimbursement to providers of medical services under the medical assistance program administered under this chapter and RSA 167. Publication of rates of reimbursement shall be exempt from the provisions of RSA 541-A.

Laws 1991, 127:1. Laws 1991, chapter 127 also amended RSA 541-A:10 (amended and reenacted as RSA 541-A:21 by Laws 1994, 412:1) by inserting the following after paragraph II:

III. Rules adopted under RSA 161:4, VI, relative to rates of reimbursement to providers of medical services under the medical assistance program, shall be exempt from the publication requirements of RSA 541-A.

Laws 1991, 127:2. As originally enacted, these two statutes resembled each other more closely than they currently do. The two statutes were passed in the same act apparently to create the same exemption. Parsing the somewhat inconsistent language of the two statutes does not clearly establish the legislature's intent. I therefore turn to the report of the legislative committee that reviewed the legislation.

> The report of the standing committee in each house of the legislature which investigated the desirability of the statute under consideration is often used as a source for determining the intent of the legislature. This is especially true when the committee sets forth its grounds for recommending passage of the proposed bill and its understanding of the nature and effect of the measure. Committee Reports represent the most persuasive indicia of [legislative] intent in enacting a statute. In that light, it has also been stated that absent contrary legislative history, a clear statement in the principal committee report is powerful evidence of legislative purpose and may be given effect even if it is imperfectly expressed in statutory language.

2A N. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 48:06, at 439-41 (6th ed. 2000). The committee report in the House of Representatives on HB 213 (1991) provides some clarification.

> The Committee was unanimous in support of this bill, which would put into law a practice which is already in place. It allows the Director of the Division of Human Services *to establish rates of reimbursement without the necessity of publication,* since there are thousands of rates and costs that fluctuate so frequently. *It only exempts the rates and not the methodology.*

N.H.H.R. JOUR. 152 (1991) (emphasis added). This confirms a distinction between "rates of reimbursement," which are exempt, and "methodology," which is not exempt. This also confirms that the emphasized phrase "rates of reimbursement" was intended to restrict the breadth of the exemption in RSA 541-A:10, III (amended and reenacted as RSA 541-A:21, III by Laws 1994, 412:1).

The minutes of a committee hearing may serve as an aid to the court in construing a statute. *See Monier v. Gallen,* 120 N.H. 333, 336 (1980)

(relying upon transcript of the committee of conference). The Senate Committee on Public Institutions, Health and Human Services held a hearing on HB 213. The sponsor of the bill, Representative Patricia Fair, testified:

> This bill, as it is written, exempts only the book of rates that are published from the Administrative Procedures Act. It does not exempt the methodology. *I want to be very clear about that because I believe that the methodology used to set rates for Medicaid needs to be part of the rate setting process and the rule making procedure.* This is only the publication of the books of rate setting . . . .

(Emphasis added.) Representative Fair concluded her testimony by reiterating the distinction between methodology and rates:

> *Methodology definitely has to be a part of rule making* and it is now. This would not exempt that. It would only exempt the rates themselves.

(Emphasis added.) Later, Philip Soulé from the division of human services testified:

> We requested this particular change in the law basically because we would be tying up the Rules Committee forever every time we changed one of our rates. We have somewhere in the neighborhood of forty to fifty thousand prescription drugs that we pay for. Those rates will change from anywhere to once a year to a monthly basis depending on the drug manufacturer's changes in their product cost. However, the formula that we use to pay a pharmacy stays the same. *The average wholesale price, minus ten percent, plus a dispensing fee.* It is the average wholesale price that is subject to change constantly.

(Emphasis added.) In response to a question from Senator Eleanor Podles whether DHHS would "be able to do what you want with the rates," Mr. Soulé replied:

> No. The rules prohibit us from doing what we want with the rates. *We have a formula that is in the rules. We have to abide by that formula.*

(Emphasis added.) Thus, those present at the hearing clearly understood that the formula ("average wholesale price [AWP], minus ten percent, plus a dispensing fee") had to go through the APA process. They anticipated

that the statute would only exempt the actual rates for "forty to fifty thousand prescription drugs."

Since the passage of RSA 161:4, VI in 1991, DHHS has consistently submitted the formula for the estimated acquisition cost (EAC) to the rulemaking process. In 1993, DHHS set EAC at AWP minus 10%. N.H. ADMIN. RULES, He-W 504.28(a)(7) (Doc. #5742, eff. December 1, 1993, exp. December 1, 1999). In 2000, DHHS established an interim rule that set EAC at AWP minus 12%. N.H. ADMIN. RULES, He-W 570.01(h) (Doc. #7392, eff. October 28, 2000, exp. December 19, 2002). In 2002, DHHS readopted the interim rule setting EAC at AWP minus 12%. N.H. ADMIN. RULES, He-W 570.01(h) (Doc. #7712, eff. June 22, 2002, exp. December 19, 2002). At the end of 2002, DHHS established that rate as a rule that remains in effect. N.H. ADMIN. RULES, He-W 570.01(g) (Doc. #7805, eff. December 21, 2002). In 2003, DHHS began the rulemaking process to set EAC at AWP minus 16%. 86 N.H. GOV. REG. 36 (2003). DHHS has apparently abandoned that effort to change the EAC formula through the APA. As a result, the current practice set by letter and the State plan (AWP minus 16%) conflicts with the agency's current rule (AWP minus 12%). *See Appeal of Smithfield Dodge*, 145 N.H. 23, 25 (2000) ("The Administrative Procedure Act requires an administrative agency to follow its own rules.")

Finally, the majority relies upon language in RSA 541-A:21, III that first appeared in 1994 when the legislature "repealed and reenacted" RSA chapter 541-A. *See* Laws 1994, 412:1. At that time, the legislature changed the last phrase of the exemption, "exempt from the publication requirements of RSA 541-A," RSA 541-A:10, III (Supp. 1993), to "exempt from the requirements of RSA 541-A:5 through RSA 541-A:14," Laws 1994, 412:1 (amending RSA 541-A:10, III and reenacting it as RSA 541-A:21, III). The legislature did not, however, change the initial phrases that, in my opinion, create a distinction between actual rates and the formula used to arrive at those rates.

I would thus conclude, based upon the ambiguity in RSA 541-A:21, III and the legislative history, that the formula for EAC is a rule that must be adopted in conformity with the provisions of the APA.